## BROMWELL BRUSH & WIRE GOODS CO. v. STATE BOARD OF CHARITIES AND CORRECTIONS.

(District Court, E. D. Kentucky, at Frankfort. February 13, 1922.)

### No. 947.

Convicts ⚖⇒10(2)—Contract held lease of inmates of prison, which board of control had no authority to make.

A contract between the board of control and a private corporation, which in form required the corporation to furnish instruction for the inmates of a house of reform, and provided for the sale of the products of the labor of the inmates by the board of control to the private corporation, but whose provisions otherwise manifested that the inmates were to be given employment which would not fit them for the trades specified, that the private corporation was to furnish the material for the work at cost, and was to pay for the finished product the price of the material furnished and a stipulated price for the labor, was, in effect, a contract for the lease of the inmates by the board of control, which it concededly had no authority to make.

In Equity. Suit by the Bromwell Brush & Wire Goods Company against the State Board of Charities and Corrections. On general demurrer to the bill. Demurrer sustained.

See, also, 279 Fed. 440.

Myers & Howard, of Covington, Ky., for plaintiff.
Chas. I. Dawson, Atty. Gen., for defendant.

COCHRAN, District Judge. This cause is before me on general demurrer. Two grounds are urged in support of the demurrer. Each goes to the point that the contract sued on is invalid. One is that the contract is lacking in mutuality. The other is that the state board of control had no power to make it. There is possibly an additional ground upon which it may be urged that the demurrer is well taken. That ground is based on the fact that the contract was made with the state board of control, and not with the defendant.

The act establishing the defendant abolished the state board of control, and I find in it no provision imposing on the defendant the duty of carrying out the contracts made by the state board of control. It is provided therein that the defendant "shall exercise all the powers and privileges and discharge all the duties now vested by law in the state board of control." The duties herein referred to would seem to

be the duties imposed on the state board of control by the act establishing it, just as the powers and privileges referred to are those conferred by such act, and not duties imposed by any contract entered into by the board in the exercise of such powers and privileges. The Legislature had power to establish a new agency to take control of the charitable institutions of the state, without imposing upon it the duty of carrying out any contract entered into by the previous agency, which seems to have been the case here, and it would seem that such duty could not arise otherwise. But I would not press this.

Nor do I deem it necessary to consider the ground that the contract is invalid for want of mutuality. This is so because it seems to me clear that the contract is invalid for want of power in the board of control ·to make it. It seems to be conceded that the board of control had no power to hire or lease any of the inmates of the House of Reform at Greendale to the defendant, as to which there can be no question, and the contract is sought to be upheld under the authority conferred upon the board to provide manual training for such inmates and to sell the products of their labor. It is true that the contract provides for instruction of such inmates and for the sale of the products of their labor by the board to the plaintiff. In the first clause of the contract, plaintiff agreed "to supply without charge expert foremen to instruct" such inmates; and by the second clause the board agreed to sell to the plaintiff "the entire output" thereof. But the opening provision of such first clause is to the effect that the board agreed with the plaintiff to employ such inmates, i. e., with the plaintiff, which is none other than an agreement to hire or lease them to plaintiff, and in the seventh clause plaintiff agreed to furnish without charge the necessary "machinery, tools, and equipment" to enable them to do that which they were to do. In so far as provision was made for instruction, it was incidental only. In order that such inmates should do that which they were employed, hired, or leased to do, they had to be instructed.

Then, in so far as provision made for a sale of the products of their labor by the board to the plaintiff is concerned, the contract was purely formal. In reality no sale was contemplated, as none was necessary, in order that plaintiff should become the owner of the products. The raw materials, out of which they were to be made, were to be provided by plaintiff at cost. This is so, notwithstanding the provision that the board had the right to purchase them from other sources of supply, if they could do so at a saving price. Neither party to the contract contemplated that it would be possible for the board to avail itself of this provision. The work of conversion of the raw material into the finished product was that of plaintiff's employees, to wit, the inmates covered by the contract, and its machinery, tools, and equipment. The products, therefore, became the property of plaintiff without the necessity of a sale. That it was in this way, and not by a real sale, plaintiff was to acquire the ownership of such products, and that the real nature of the contract was one of hiring or leasing, is made apparent by the provision as to the purchase price to be paid by plaintiff to the Board. It was to be the cost of the raw material plus the labor charges specifically provided for. As plaintiff was entitled to the cost of the

material furnished by it, in reality what plaintiff was to pay the board was such labor charges.

This contract, therefore, was nothing more than a hiring or leasing of the inmates by the board to plaintiff for such labor charges; the products of their labor becoming the property of plaintiff by virtue of the fact that it provided the raw materials, labor, machinery, tools, and equipment with which to make them. The manual training which the act creating the board of control contemplated should be provided the inmates of such House of Reform was to be supplied by employees of the board. It was expressly provided that to this end "competent persons shall be employed as instructors" and that the superintendent should "cause the inmates to be employed at such labor and such hours as may be designated by the board." Furthermore, the end for which such training was to be provided was the betterment of the inmates. This, and this only, was to be the sole motive of providing it; and it was only articles so produced—i. e., by such instruction and in pursuance of such motive—that the board was authorized to sell.

Under the contract in suit the manual training contemplated was to be provided, not by employees of the board, but by employees of plaintiff, and the motive behind the contract was not the betterment of the unfortunate inmates, but the almighty dollar. The plaintiff had no other motive in entering into the contract than what it would make out of it; and the impelling motive, so far as the board was concerned, was the profit that would accrue to the state through it. By the eleventh clause plaintiff guaranteed a certain profit to the board out of the transaction. In the first clause of the contract its purpose is avowed. That first stated is "the patriotic purpose of utilizing the idle labor in said institution (conservation of labor being particularly desirable during war times)." This purpose comes short of that of the betterment of the inmates, though it was better for them to be at work than to be idle. It was realized that this was the case. So a second purpose was stated. The statement is:

"For the specific purpose of teaching said inmates useful trades, thus producing skilled woodworkers, turners, carpenters, wireworkers, tinsmiths, machinists, and other trained mechanics."

That which they were to be employed in doing, as set forth in the first clause, was manufacturing "brushes, brush materials, rat traps, and other articles." In the eleventh clause the apprenticeship provided for, at the start, was 30 days, and thereafter 15 days. No charge was to be made for the output of an apprentice. According to this the trade of making brushes, brush materials, and rat traps could be acquired in 15 days after the work got started. It is difficult to see how it was possible for skilled woodworkers, turners, carpenters, wireworkers, tinsmiths, machinists, or other trained mechanics to result from such employment. The outcome could hardly be more than skill in making brushes, brush materials, and rat traps, and it is not unlikely that, if any of the inmates desired to make use of such skill after being released, they would have to leave the state to find opportunity to do so.

The demurrer is sustained.