PRICE v. MABEY et al., State Board of Corrections (UTAH MANUFACTURERS' ASS'N et al., Interveners).

No. 4024.   Decided September 8, 1923.   (218 Pac. 724.)

CONVICTS—CONTRACT HELD VOID AS ONE FOR "LABOR OF PRISONERS." A contract between the state board of corrections and an overall and shirt manufacturer, providing for the installation by the manufacturer of manufacturing equipment in the state prison, and the purchase by the manufacturer from the state of all shirts and overalls manufactured therein with prison labor under the supervision of the warden, out of material furnished by the manufacturer, in excess of those needed in state institutions, *held* void as a contract for the labor of prisoners confined in the state prison, in violation of Const. art. 16, §§ 2, 3, and Compiled Laws 1917, § 5475, in view of sections 5449, 5455, 5476, 5477, 5481, 5508, the contract being in effect one for the sale of labor, and not merely a contract for the sale of goods.

Petition for writ of prohibition by Fred W. Price against Charles R. Mabey, Samuel W. Stewart, and James Ivers, Jr., constituting the State Board of Corrections, in which the Utah Manufacturers' Association and another intervened.

ALTERNATIVE WRIT MADE PEREMPTORY.

Prohibition

*Walton & Walton* and *Hamilton Gardner*, all of Salt Lake City, for plaintiff.

*Harvey H. Cluff*, Atty. Gen., and *Stewart, Stewart & Alexander*, of Salt Lake City, for defendants.

WEBER, C. J.

Plaintiff has filed his petition for writ of prohibition, requiring the defendants Hon. Charles R. Mabey, Hon. Samuel W. Stewart, and Hon. James Ivers, Jr., constituting the board of corrections, to desist and refrain from carrying out a contract entered into by the board with the Pioneer Garment Manufacturing Company, a Utah corporation. The Utah Manufacturers' Association, a corporation, has intervened.

It is claimed by the plaintiff and interveners that defendants have entered into a contract with the Pioneer Garment Manufacturing Company that is unlawful, and in contravention of the laws of this state, and which is beyond the powers and jurisdiction of the board to make. The following is a synopsis of the contract in question, the state board of corrections being the party of the first part, and the Pioneer Garment Manufacturing Company being the second party:

The party of the first part agrees to provide at the State Prison, Salt Lake City, Utah, factory rooms on two floors of what is known as No. 3 cell house, the floor space approximating 6,000 square feet, said building to be equipped with machinery and other equipment to be supplied by the Pioneer Company, party of the second part, and to be used by the state of Utah as a factory for the manufacturing of work shirts and overalls. Party of the first part agrees to arrange the building so as to provide for a stockroom, office, and general workroom; that it will install a small elevator to convey materials from floor to floor; that it will keep the building properly heated and ventilated; that it will sell to the second party at a price and on terms set forth in the contract any surplus output of overalls and work shirts manufactured in said factory and not used by the first party in the penitentiary or such other state institutions as first party may desire

to supply with such overalls and work shirts; that it will not sell to any one except said second party, without the written permission of the second party, any overalls or shirts manufactured in said prison factory—provided that nothing contained in the contract shall limit the sale by first party of overalls or shirts to the various Utah state institutions. The first party further agrees to furnish all electric power required for lighting and operating the factory; and if the building occupied for the manufacture of said shirts and overalls should be destroyed by fire or other casualty to repair and rebuild the same with reasonable dispatch. First party agrees that it will pay second party monthly the full cost to second party of all materials and supplies used by first party in the manufacture of overalls and shirts which first party sells to or furnishes the state penitentiary or other Utah state institutions.

The second party agrees to purchase from the first party the entire output of overalls and shirts manufactured at the State Prison, during the term of the agreement, which are not required by the first party for use of Utah state institutions, and agrees in addition to furnish materials therefor, supply instructors, foremen, etc., as hereinafter provided, agrees to pay the state of Utah for all shirts and overalls delivered to it at the prison factory, packed and ready for shipment, the sum of 45 cents per dozen, payment to be made monthly. The second party further agrees to furnish and install in said factory, at its own expense, the latest improved machinery, tools and equipment necessary to manufacture overalls and work shirts, and to keep such machinery and equipment in good condition and repair; that it will, at its own expense, furnish first party f. o. b. prison factory the necessary cloth, buttons, thread, labels, wrapping paper, twine, boxes, and other raw materials used in the manufacture and packing for shipment of said shirts and overalls, but it shall not be required to furnish machinery or materials in quantities greater than to keep 200 men employed in said factory; that, at its own expense, it will furnish capable instructors to teach the persons employed by first party the proper handling of the machinery, and the art of manufactur-

ing work shirts and overalls, and at its own expense maintain
at all times a competent superintendent and teachers quali-
fied to supervise the work of said factory.

The contract provides for carrying insurance at the ex-
pense of the party of the first part, and also that if second
party shall fail to pay, for merchandise agreed to be pur-
chased, promptly when the payment is due, the first party
may, after default, terminate the contract. It is further
provided that the discipline of the factory and the manage-
ment of all persons employed therein shall at all times be un-
der the sole care and control of the warden and the first
party, and all agents and employés of second party shall be
subject to and governed by the rules and regulations pro-
mulgated for the management and control of said factory by
the warden or said first party. The second party shall not
place at said prison factory as its representative any person
or employé not satisfactory to or approved by the warden
and said first party.

The contract provides that within a stated time the fac-
tory rooms shall be designated, and within which it shall be
equipped with necessary machinery to provide employment
for at least 75 persons; that the contract shall be in force for
three years, with option for renewal of three years; provides
for execution of a bond in the sum of $25,000 by second party
for its faithful performance of the contract; that the first
party shall have a lien on the machinery, tools, equipment,
materials, and manufactured products in or left upon said
prison premises as further security for the performance of
the contract; that if legal proceedings be commenced in the
courts of this state to prevent either of the parties from per-
forming the agreement, and the court shall hold that the first
party is without legal right to execute the agreement the
same shall be void, but if such legal proceedings be terminated
in favor of the validity of the agreement, the same shall be
effective as of the date of the final determination of said pro-
ceedings; that title to all machinery and equipment placed in
the factory by second party, and all materials delivered to
said factory by second party, shall at all times remain in said

second party; that the overalls and shirts manufactured shall be of a common pattern, similar to samples submitted with the agreement; that if the surplus output of the factory shall, after six months from commencement of work, be less than 75 dozen shirts and overalls per day, the second party may terminate the contract and remove its machinery, after giving 30 days notice; that the first party may at any time during the term of the agreement purchase from second party the machinery and equipment and tools placed in the factory by second party, the purchase price to be the then reasonable. value of said property; that if second party should establish in Salt Lake City a factory for the manufacture of shirts and overalls separate from the prison factory, second party agrees, when such factory is established, to at all times give preference in employment to ex-inmates of the state penitentiary who have had experience and shown adaptability for making overalls and shirts in the prison factory, and that said second party agrees to pay such ex-inmates so employed the same wages paid to other employés possessing an equal amount of experience.

The contract provides that it cannot be sold, assigned, or transferred without the written consent of the first party.

The first proposition advanced by plaintiff and interveners is that the making of the contract by the state board of corrections is a direct violation of the Constitution of this state. Article 16, § 3, of the Constitution of Utah provides in part as follows:

"The Legislature shall prohibit:   *   *   *

"(2)   The contracting of convict labor.

"(3)   The labor of convicts outside prison grounds, except on public works under the direct control of the state.   *   *   *"

It is argued by plaintiff that the prohibition against contracting of convict labor is all-inclusive, that it carries with it the interdiction of any and all contracts of which convict labor forms the basis. On the other hand, counsel for defendants argue that the purpose of this provision of the Constitution is to protect the weak against injustice; that the prohibition of prison labor was not designed to eliminate com-

petition of prison labor with free labor, but to protect the convicts themselves from inhuman treatment.

During the discussion of the subject in the constitutional convention, Delegate Bowdle said:

"Mr. Chairman, I am in favor of striking out the first two of these sections, but the two relating to convict labor question I am not in favor of striking out. I understand that we have declared in this Constitution that it shall be mandatory. I think that has already been passed. And it shall be mandatory upon the Legislature to pass a law that there should be no contract of convict labor or that the labor of convicts outside of the prison grounds, except on public works. Perhaps some of you remember two or three years ago, or a little longer than that, the trouble they were having, I think in Tennessee, where they were farming out the convict labor. They had no provision like this in their Constitution."

Mr. Goodwin:

"May I remind the gentleman that he is treading on dangerous ground when he goes to Tennessee, with Mr. Maloney on the floor."

Hon. Thomas Maloney, whose former residence in Tennessee was referred to by Mr. Goodwin, said:

"Mr. Chairman: What Mr. Bowdle says as to the competition of convict labor is true. It has been a source of trouble for a number of years. Convict labor was in competition with honest labor. It was the same way in Arkansas and in Texas. I agree with Mr. Bowdle, that sections 1 and 2 ought to be stricken out, but that sections 3 and 4 ought to be in the Constitution. If we keep it in the Constitution then the Legislature cannot farm out convict labor. * * * We want those convicts to be self-supporting, and that the honest men who are working by day's work shall not be compelled to support them, and at the same time we do not want convict labor put into the market in competition with honest labor."

The debate in the convention clearly discloses that the purpose of the framers of the Constitution was not only to prevent mistreatment of convicts, but was also to prevent, as far as possible, competition of convict with free labor, and competition of convict made goods with those not manufactured in prison.

In obedience to the mandate of the Constitution and in harmony with its spirit the first Legislature of Utah adopted

laws upon the subject. The board of corrections was created, to consist of the Governor and two other members appointed by him. This board was given certain powers, and has none except those expressly delegated to it by statute. The principal provisions of the statute defining the duties of the board and of the prison officials are these:

Comp. Laws Utah 1917, section 5449, provides that the board of corrections may appoint persons having the necessary practical knowledge to be overseers of such work as may be established, when in its judgment such appointment will promote the efficiency of the prison labor.

Section 5455 provides:

"It shall be the duty of the warden under the rules and regulations adopted by the board for the government of the prison:

"1. To exercise a general superintendency over the government, discipline, and police of the prison, and to superintend all the business concerns thereof; * * *

"4. To use every proper means to furnish employment to prisoners most beneficial to the state and best suited to their several capacities;

"5. To superintend any manufacturing and mechanical business that may be carried on by the state, pursuant to law, within the prison; to receive the articles manufactured, and to sell and dispose of the same for the benefit of the state. * * *

Section 5475: "It shall be the duty of the prison board to meet at least once in six months to determine what lines of productive labor shall be pursued in the prison, and in so determining the board shall select diversified lines of industry with reference to interfering as little as possible with the same lines of industry carried on by citizens of this state. No contract shall be made for the labor of prisoners confined in the state prison, but they shall be employed by the warden under rules and regulations established by the board.

Section 5476: "The board shall be required to employ as many prisoners as are necessary in making articles for the various state institutions, as far as practicable; and the state institutions shall pay to the prison the market price of all articles furnished.

Section 5477: "For the purpose of reclaiming, by irrigation, state lands, and for the purpose of furnishing public work for convicts confined in the state prison, the state board of corrections is hereby authorized to locate and construct, in the name of and for the use of the state, ditches, canals, reservoirs, and feeders, for irrigating and domestic purposes, and for that purpose may use

convict labor of persons confined, or that may be confined, as convicts in the state prison.

Section 5481: "All convicts, other than such as are confined in solitude for misconduct in the prison, shall as far as practicable be kept constantly employed at hard labor for an average of not less than eight hours a day, Sundays and holidays, excepted, unless incapable of laboring by reason of sickness or other infirmity.

Section 5508: "Convict labor may be utilized in providing material for constructing roads and also in the construction and improvement of roads, the prisoners in the county jail may be required to work upon county roads under regulations made by the board of county commissioners, and prisoners in the state prison may be required to work upon state roads."

The prohibition contained in section 5475, that no contract shall be made for the labor of prisoners confined in the state prison, is determinative of this case. It is not disputed that if the contract with the Pioneer Garment Company is a contracting of prison labor or hiring out of prison labor it is invalid. If it is not a contracting or hiring out of prison labor it is valid. By the parties to the contract it is claimed that:

"A fair construction of the contract involved must lead to the conclusion that it is nothing more or less than a contract of sale. The labor is not being contracted for, and there is no intention of contracting for the labor in the sense of hiring labor, any more than there is such intention in the ordinary order of goods from the manufacturer. The thing contracted for is the result or product of labor, not the process or labor itself."

The question, then, is, Does the contract provide for a sale of labor, or does it provide for the sale of goods? There are two well-known systems of contract labor, one known as the contract system and the other as the piece-price system, the principal difference between the two being that in one system the convicts are employed and paid for by the day, and under the other they are employed and paid for by the piece. In 6 New International Enc. p. 22, it is said:

"The contract system exists in two forms. In the first the labor of the convicts is furnished to contractors for a fixed sum, the contractors, personally directing the employment in the institution. The raw material and machinery are furnished by the contractor, though in some cases the state furnishes the latter. In the second form, the piece-price system, the contractor furnishes the material and pays a stipulated price for the finished product. The

direction of the industry is in the hands of the prison officials. The advantage of this form is that it avoids the possibility of trouble coming from the presence in the institution of employers who are not directly responsible to the authorities."

The piece-price system is thus defined in 1 Cyc. American Government, 466:

"A method by which the contractor furnishes machinery and materials *and the state is paid for the labor of the prisoners by the piece.* It has been claimed that this system was free from the objections to the contract system because the contractor reaps no advantage from speeding the prisoner. The system, however, is not widely used." (Italics supplied.)

What does the state agree to supply under this contract with the Pioneer Garment Company? It supplies neither machinery nor goods. Incidentally it furnishes a building, light, heat, and air, but the main thing is labor; it is labor only that the agreement gives the Garment Company from the state, and it is convict labor only which the Garment Company pays for. Reduced to its simplest form the contract provides for the furnishing of labor by the state, and for the payment of that labor by the contractors. What difference does it make whether the contractor pays the state 45 cents per dozen for the labor of the prisoners in making a dozen shirts and overalls or whether it pays the state 45 cents per day for the labor of the prisoner? The latter is the direct contract system—as defined above—the former is the piece-price system of contract labor. However plausible it may be as a sophism, the proposition is in its essence a contract for the hiring of prison labor.

The agreement is skillfully drawn, with an apparent attempt to avoid the constitutional and statutory provisions against contracting prison labor. An obvious attempt is made to do indirectly that which the law forbids being done directly. In its last analysis the contract is one that sells prison labor, not shirts and overalls, although the words "labor," "convict," "convict labor," or "prison labor," do not occur in the contract. Instead, the words used are "persons employed by the state." The attempted evasion is palpable. Purchase by the contractors of the surplus not needed by the state is provided for, and that, of course, is the principal part

of the product, and is to be sold on the open market by the contractor. What is used by the state is only incidental. That which is sold to the state must be sold at the market price. Comp. Laws Utah 1917, § 5476. The market price being of no importance when the state sells to itself, the only purpose of reference to the market price in section 5476 is to prevent, as far as possible, competition with the same lines of industry engaged in by citizens of the state. Section 5475, supra. Counsel for the Garment Company contends that market price means the market price of other prison made goods that are sold in the state. If such be the intent of the law, how can the warden, whose duty it is "to receive the articles manufactured, and to sell and dispose of the same for the benefit of the state" (subdivision 5, § 5455), and who will have nothing to do with sales under this contract, except the small amount taken by the state institutions, sell the shirts and overalls at the market price when he sells his entire surplus at 45 cents per dozen?

Many other questions are discussed in the briefs of counsel for the parties, but the propositions advanced are not controlling.

Counsel for the board have called attention to *State* v. *Henry*, 87 Miss. 1, 39 South. 856. In that case suit was brought in the name of the state of Mississippi by Jas. K. Vardaman, Governor of the state, as complainant against the warden and others, to enjoin the board of prison control from making or executing a lease of a certain farm from one Mc-Laurin, or from working any convicts thereon, or from carrying out the same. An injunction was prayed for. The preliminary injunction which had been granted was dissolved on the ground that the Governor was not empowered by the Constitution to institute a suit for and in the name of the state. Another suit was thereafter instituted by the *State of Mississippi ex rel. J. B. Graves, District Attorney, v. Henry*, as Warden of the Penitentiary. This was a mandamus proceeding seeking to compel the warden to remove all state convicts from a leased farm, and to place them and keep them on a farm owned by the state. 87 Miss. 125, 40 South. 152, 5

L. R. A. (N. S.) 340. The question was whether the board
of control of the state prison had the power under the Con-
stitution to work convicts on leased lands. As stated in the
opinion of the court, ''We are simply to say whether a leased
farm may be a state farm, whether land must be bought and
owned in fee simple before it can be a state farm, or whether
a lease for one or five hundred years would be void.'' It was
held that a farm leased by the state is a state farm and not
a private farm, and that a contract by the board of control
of the penitentiary wherein it agrees to work the plantation
with convict labor, the state to receive all products of the
land up to $25,000 in value, all sums above that amount to
go to the owner of the land, is a lease of land, and not a
hiring of convicts to the owner.

A different, and we think correct, conclusion was reached
in *Bromwell Brush & Wire Goods Co.* v. *State Board of
Charities & Corrections* (D. C.) 286 Fed. 737, in which the
plaintiff sued the defendant to recover damages resulting to
it by reason of a breach of contract for the output of certain
products from a state reformatory of Kentucky. A general
demurrer to the complaint was sustained. The facts, as
pleaded in the complaint, are strikingly similar to those of
the case at bar. We are indebted to counsel for defendant
for a copy of the contract upon which was based the com-
plaint in that case. The contract was between the state of
Kentucky and the Bromwell Brush & Wire Goods Company,
for the employment of the male inmates of the house of re-
form in the manufacture of brushes, brush materials and
other articles. The first clause of the contract is especially
interesting because of its altruism. It provides that the party
of the first part—

"believing in the employment of the male inmates of the state
houses of reform, at Greendale, Ky., whose labor is not otherwise
employed by the institution, do hereby agree with the party of the
second part to employ said male inmates in the manufacture of
brushes, brush materials, rat traps, or other articles for the pa-
triotic purpose of utilizing the idle labor in said institution (con-
servation of labor being particularly desirable during war times),
and for the specific purpose of teaching said inmates useful trades,
thus producing skilled woodworkers, turners, carpenters, wire-

workers, tin smiths, machinists and other trained mechanics, who will be useful, self-supporting citizens, when they cease to be inmates of said houses of reform, and the party of the second part hereby agrees to supply, without charge, expert foremen to instruct said inmates."

The contract further provided that the second party should purchase the entire output of the factory; that the inmates employed should number from 200 to 400 as agreed upon by the parties; that four and one-half hours should constitute a day's work. Party of second part agreed to keep on hand supply of raw materials and to sell same to first party at actual cost plus freight, with usual cash discount, but party of first part reserved the right to purchase raw materials elsewhere if it could do so at a saving. Party of the first part agreed to furnish sufficient shop room, heat, light, water and power, without charge, the party of second part to furnish at its own expense all machinery, tools, equipment, etc., and to keep same in repair, title to said machinery, etc., to remain in second party.

It was further agreed that first party would furnish guards to maintain discipline and keep the inmates diligently employed, and would furnish inmates to keep the factory clean.

Second party was to supply samples of the styles and sizes of goods to be manufactured. It was further provided:

"The prices to be paid for the articles manufactured under this agreement are to be based upon the cost of the raw material used in the manufacture of said articles, plus a charge for labor, based on piece prices as set forth in schedule A, attached herewith. When new articles are added to the line, they are to be computed on the same basis.

"It is further agreed that the party of the second part will guarantee that the prices so fixed shall yield a profit to the party of the first part equal to 25 cents per day (of 4½ hours) for all able-bodied inmates 16 years of age or over, or equal to 15 cents per day (of 4½ hours) for all other inmates working under this agreement. * * *"

The contract provided for payment for manufactured articles each month. A bond of $10,000 was required of second party for faithful performance. The agreement was to run for 18 months with privilege of four-year extension.

This contract was held invalid by the court. The reason-

ing of the court is applicable to the case at bar, and is sound and logical. In its analysis of the contract, the court said:

"It seems to be conceded that the board of control had no power to hire or lease any of the inmates of the House of Reform at Greendale to the defendant, as to which there can be no question, and the contract is sought to be upheld under the authority conferred upon the board to provide manual training for such inmates and to sell the products of their labor. It is true that the contract provides for instruction of such inmates, and for the sale of the products of their labor by the board to the plaintiff. In the first clause of the contract, plaintiff agreed 'to supply without charge expert foremen to instruct' such inmates; and by the second clause the board agreed to sell to the plaintiff 'the entire output' thereof. But the opening provision of such first clause is to the effect that the board agreed with the plaintiff to employ such inmates, i. e., with the plaintiff, which is none other than an agreement to hire or lease them to plaintiff, and in the seventh clause plaintiff agreed to furnish without charge the necessary 'machinery, tools, and equipment' to enable them to do that which they were to do. In so far as provision was made for instruction, it was incidental only. In order that such inmates should do that which they were employed, hired, or leased to do, they had to be instructed. Then, in so far as provision made for a sale of the products of their labor by the board to the plaintiff is concerned, the contract was purely formal. In realty, no sale was contemplated, as none was necessary, in order that plaintiff should become the owner of the products. The raw materials, out of which they were to be made, were to be provided by plaintiff at cost. This is so, notwithstanding the provision that the board had the right to purchase them from other sources of supply, if they could do so at a saving price. Neither party to the contract contemplated that it would be possible for the board to avail itself of this provision. The work of conversion of the raw material into the finished product was that of plaintiff's employees, to wit, the inmates covered by the contract, and its machinery, tools, and equipment. The products, therefore, became the property of plaintiff without the necessity of a sale. That it was in this way, and not by real sale, plaintiff was to acquire the ownership of such products, and that the real nature of the contract was one of hiring or leasing, is made apparent by the provision as to the purchase price to be paid by plaintiff to the board. It was to be the cost of the raw material plus the labor charges specifically provided for. As plaintiff was entitled to the cost of the material furnished by it, in reality what plaintiff was to pay the board was such labor charges."

Our conclusions are that the contract here involved is a plain and unmistakable contracting of convict labor—and is therefore repugnant to the Constitution, and is forbidden by the statutes of this state.

The alternative writ will be made peremptory. No costs will be taxed in favor of either party.

GIDEON, THURMAN, and CHERRY, JJ., concur.

FRICK, J., did not participate.