[No. 70814-2. En Banc.]
Argued October 28, 2003. Decided May 13, 2004.

WASHINGTON WATER JET WORKERS ASSOCIATION, ET AL., *Appellants*, v. HOWARD YARBROUGH, *as Administrator of the Division of Correctional Industries*, ET AL., *Respondents*.

*Richard M. Stephens* (of *Groen Stephens & Klinge, L.L.P.*), for appellants.

*Michael G. Ballnik* (of *Cozen & O'Connor*); *Christine O. Gregoire, Attorney General,* and *Talis M. Abolins* and *Carol A. Murphy, Assistants*; and *Robert G. Nylander, Jr.,* and *Philip E. Cutler* (of *Cutler Nylander & Hayton, P.S.*), for respondents.

*Hugh D. Spitzer* on behalf of AFL-CIO and Washington State Labor Council, amici curiae.

*Greg Overstreet* and *Kristopher I. Tefft* on behalf of Association of Washington Business, amicus curiae.

*Greg Overstreet* on behalf of Monroe Welding, Inc., National Federation of Independent Business, Standard Steel Fabricating, Inc., and United Iron Works, Inc., amici curiae.

*Gregory M. Miller* and *Anne E. Melley* on behalf of Private Industries in Prison Association, Seven Class I Industry Employers and The Workman Fund, amici curiae.

BRIDGE, J. — In *Washington Water Jet Workers Ass'n v. Yarbrough*, 148 Wn.2d 403, 61 P.3d 309 (2003) (*Water Jet* I), this court held that article II, section 29 of the Washington Constitution solely applies to and prohibits the State from engaging in the contract system of prison labor. *Id.* at 405-06. Under that holding, the existing Class I Free Venture Industries program of prison labor created by RCW 72.09.100(1) did not violate article II, section 29. *Water Jet* I, 148 Wn.2d at 406. A motion for reconsideration was filed by the Washington Water Jet Workers Association (Water Jet). After review, we granted the motion and ordered a rehearing.

Upon rehearing, both the parties and amici, including the Private Industries in Prison Association et al., and the Washington State Labor Council et al., have submitted thorough historical analyses of the circumstances surrounding the adoption of article II, section 29. With the benefit of the additional historical analyses brought to light upon rehearing, we now conclude that both the plain language of article II, section 29 and the historical context in which it was adopted require that we find Class I Free Venture Industries programs, permitted by RCW 72.09-.100(1), to be in direct conflict with article II, section 29 of the Washington Constitution.

Even so, we note the important public policy goals that the legislature and the Department of Corrections (Department) sought to promote when they created the Class I Free Venture Industries program. The legislature intended to avoid inmate idleness, encourage adoption of the work ethic, provide opportunities for inmate self-improvement, and provide a means for payment of restitution. RCW 72.09.010(5)(a)-(c), (7). These laudable goals need not be abandoned as a result of our holding today. We stress that there are other opportunities, in the form of state-run inmate labor programs, which would not run afoul of article II, section 29.

## I

## Class I Free Venture Industries

In 1981,[1] the legislature enacted the Corrections Reform Act of 1981, chapter 72.09 RCW, providing for five classes of prison labor. *See* RCW 72.09.100.[2] The first class of prison labor in RCW 72.09.100, Class I Free Venture Industries, permits inmate work programs that are operated and managed by private profit or nonprofit entities other than the Department. RCW 72.09.100(1).[3]

Pursuant to RCW 72.09.100(1), the Department created a program of inmate labor called "private sector partnerships." *See* Clerk's Papers (CP) at 22-30. The Department enticed employers with the promise of low overhead costs and a motivated and readily available work force. *Id.* The Department's promotional materials presented the allure of

---

[1] Two years prior, Congress had amended the Ashurst-Sumners Act, 18 U.S.C. § 1761, to allow for the interstate transport of goods made by prisoners in state institutions, provided certain criteria were met.

[2] The legislature has since amended RCW 72.09.100(1), but the relevant language remains essentially the same.

[3]
CLASS I: FREE VENTURE INDUSTRIES. The employer model industries in this class shall be operated and managed in total or in part by any profit or nonprofit organization pursuant to an agreement between the organization and the department. The organization shall produce goods or services for sale to both the public and private sector.

. . . .

The department of corrections shall supply appropriate security and custody services without charge to the participating firms.

Inmates who work in free venture industries shall do so at their own choice. They shall be paid a wage comparable to the wage paid for work of a similar nature in the locality in which the industry is located, as determined by the director of correctional industries. If the director cannot reasonably determine the comparable wage, then the pay shall not be less than the federal minimum wage.

RCW 72.09.100(1).

The statute also establishes classes of inmate labor for "TAX REDUCTION INDUSTRIES," "INSTITUTIONAL SUPPORT INDUSTRIES," "COMMUNITY WORK INDUSTRIES," and "COMMUNITY RESTITUTION PROGRAMS." RCW 72.09.100(2), (3), (4), (5). These additional classes are not before this court for consideration.

a higher profit margin. CP at 23. Businesses were told that they could save the costs of health insurance and other employment-related benefits, and could potentially receive bid preferences on state contracts. CP at 24. The Department, meanwhile, would benefit because inmates would obtain training and skills that could help them become an integral part of society upon release, and employment might encourage a strong work ethic among inmates. The inmate workers would pay taxes on their earnings, and wage deductions would be available to compensate victims and/or provide child support payments.

■■ Consistent with this promotion, the Department entered into a contract with Jet Holdings, Ltd., d/b/a MicroJet (MicroJet), that allows MicroJet to use prison labor from the Monroe Corrections Center in its water jet cutting business. CP at 5-16, 18. In addition to providing access to prison labor that MicroJet's competitors do not enjoy, the contract allows MicroJet to use more than 11,000 square feet of industrial space at the correctional facility rent-free. Many utilities are provided to MicroJet free of charge or at discounted rates. The Department also agreed to provide security and a security orientation session. Under the terms of the agreement, the Department refers prison inmates to MicroJet, the company interviews and hires the inmates, and then MicroJet pays inmate wages to the Department as trustee for the inmate-workers.[4]

---

[4] Amici, including the Private Industries in Prison Association, the Workman Fund, and the Class I Employers, have requested that this court take judicial notice of facts contained in a newspaper article, describing the recent success of a Washington water jet cutting business. We deny the motion because the article is not relevant to the disposition of the question before us and because the contents of the newspaper article are not the proper subject of judicial notice. *See* ER 201(b); *see also Hoppe v. State*, 78 Wn.2d 164, 170 n.3, 469 P.2d 909 (1970) (holding that where appellant referred only to newspaper articles and an undated motel rate schedule, he had presented no authoritative facts of which the court could properly take judicial notice). Amici concurrently submitted a statement of additional authority, the subject of which was considered by the court.

## II

## Article II, Section 29

■ ■ When interpreting constitutional provisions, we look first to the plain language of the text and will accord it its reasonable interpretation. *Anderson v. Chapman*, 86 Wn.2d 189, 191, 543 P.2d 229 (1975) (citing *State ex rel. Evans v. Bhd. of Friends*, 41 Wn.2d 133, 247 P.2d 787 (1952)). Article II, section 29 states:

> After the first day of January eighteen hundred and ninety the labor of convicts of this state shall not be let out by contract to any person, copartnership, company or corporation, and the legislature shall by law provide for the working of convicts for the benefit of the state.

CONST. art. II, § 29. The words of the text will be given their common and ordinary meaning, as determined at the time they were drafted. *State ex rel. O'Connell v. Slavin*, 75 Wn.2d 554, 557, 452 P.2d 943 (1969) (citing *State ex rel. Albright v. City of Spokane*, 64 Wn.2d 767, 394 P.2d 231 (1964)). This court may also examine the historical context of the constitutional provision for guidance. *See Yelle v. Bishop*, 55 Wn.2d 286, 291, 347 P.2d 1081 (1959) ("In determining the meaning of a constitutional provision, the intent of the framers, and the history of events and proceedings contemporaneous with its adoption may properly be considered.").

### A. *Systems of Convict Labor*

At the time of Washington's constitutional convention, a variety of prison labor systems existed. To determine the common and ordinary meaning of article II, section 29 at the time it was drafted, it is helpful to briefly review the systems of prison labor that would have been contemplated by the delegates to the constitutional convention. The systems have traditionally been divided into two categories: private systems and public systems. WILLIAM J. FARRELL,

PRISONS, WORK AND PUNISHMENT 30 (1994); CHAS. P. NEILL, TWENTIETH ANNUAL REPORT OF THE COMMISSIONER OF LABOR, CONVICT LABOR 40-41 (1905).

1. *Private Systems*—There were three private systems of convict labor in the late 1800s: the lease system, the contract system, and the piece-price system. FARRELL, *supra*, at 30. Under the lease system, which was prevalent in the southern states after the Civil War, the State entered into a contract with a private lessee, who agreed to feed, clothe, house, and guard the convict. *Id.* at 28, 31. Inmate labor under this system was in direct competition with free labor. *Id.* at 30.

Because the lease system put the convict at the mercy of the lessee, inmates were often subjected to "unspeakable brutality." Stephen P. Garvey, *Freeing Prisoners' Labor*, 50 STAN. L. REV. 339, 357 (1998); *see also* DAVID M. OSHINSKY, "WORSE THAN SLAVERY" PARCHMAN FARM AND THE ORDEAL OF JIM CROW JUSTICE (1996) (discussing the history of the lease system in Mississippi). Even so, one historian has concluded that the lease system died "not because of its unrelenting cruelty but because of its susceptibility to the fluctuations of the marketplace; especially during the depressions of the 1870s and 1880s." FARRELL, *supra*, at 31.

Unlike the lease system, the contract system required the State to feed, clothe, house, and guard the inmate. *Id.* at 28. The State selected a private contractor to manufacture its product within or near the prison, and provided convict labor. *Id.* In exchange for the benefit of the prisoners' labor, the contractor paid a stipulated amount for the services of each convict, provided raw materials, and supervised the convicts' work within the prison. *Id.* Although there is some historical evidence that the treatment of prisoners under the contract system was often cruel, at least one commentator has stated that the treatment of inmates was not that different from the treatment of free laborers. James J. Misrahi, Note, *Factories with Fences: An Analysis of the Prison Industry Enhancement Certification Program in Historical Perspective*, 33 AM. CRIM. L. REV. 411, 416 (1996).

Again, convict labor under the contract system competed directly with free labor. FARRELL, *supra*, at 30. Moreover, this system allowed the State to favor one private contractor with inexpensive labor and overhead, to the detriment of its competitors.

The piece-price system was very much like the contract system, except the State was paid according to an agreed amount for each piece or article manufactured by the inmates, rather than a set price for each working inmate. *Id.* at 28. The contractor provided the raw materials and shouldered the financial risk, but in most instances, the State supervised the inmates' work. *Id.* at 28-29. Still, the piece-price system engendered the same competition issues that befell the lease and contract systems. *Id.* at 30. The private enterprise relied on prison labor, rather than free labor, and the State chose to favor one private enterprise with the benefits of prison labor.

2. *Public System*—There were two public systems of convict labor in the late 1800s: the public account system and the state-use system. *Id.* at 29-30. Under the public account system, the State owned and operated all aspects of the prison manufacturing operation; it provided raw materials, supervised the inmate workers, and sold the product into the marketplace. *Id.* at 29. Inmates did not directly displace free workers by taking private industry jobs. Moreover, the State did not favor one company over another with the benefit of prison labor. Still, public account systems produced goods that competed in the marketplace with private sector goods, creating indirect price competition. *Id.* at 30.

The state-use system was more restrictive because the resulting products were not sold into the open market; instead, they were put only to state use. *Id.* at 29. Therefore, the State did not compete directly with manufacturers who were employing free labor, nor did the system favor any particular business. *Id.* at 29. Variations of the state-use system emerged, including public works systems, which employed inmates for public work outside of the prison,

usually in the construction and repair of public highways. *Id.* at 29.

Several states examined their prison labor systems just before or just after Washington's constitutional convention. Where a state replaced its contract or lease system, it is important to note how the system was replaced. For example, during its constitutional convention of 1894, New York passed a "state-use" regulation, prohibiting the sale or lease of convict labor and requiring that prison labor produce products that the State itself could consume. E. STAGG WHITIN, PENAL SERVITUDE 7 (1912) (noting the nationwide movement toward state operated prison industries). Significantly, "[t]he state-use system came into prominence in the decade of the 1880s, when the contract system began to decline. By 1899, the [state-use] system had been authorized by 24 states . . . ." FARRELL, *supra*, at 32. In addition, the proportion of convicts employed under all public systems increased from 32.8 percent in 1885 to 52.2 percent in 1903-04. NEILL, *supra*, at 40-41. Thus, just before and just after Washington's constitutional convention, there was a trend to replace private systems of inmate labor with public, state-run systems.

It is with an understanding of these various systems of convict labor, including the contemporaneous decline of the private systems, that we approach the interpretation of article II, section 29.

## B. *Plain Language*

■ When read in its entirety, article II, section 29 requires the State to engage in one of the public, state-run systems of prison labor (public account or state use), but prohibits the State from engaging in any private system of prison labor.

■ First, we must look to what the provision prohibits. The first clause provides, "the labor of convicts of this state shall not be let out by contract to any person, copartnership, company or corporation." CONST. art. II, § 29. The Depart-

ment argues that "let out" is a term of art, whose common and ordinary meaning in 1889 referred only to the sale or lease of something as a commodity. Thus, the Department, and likewise the dissent, contend that article II, section 29 prohibits only those systems through which the State sold or leased convict labor, namely the lease and contract systems.

*The Century Dictionary* includes a definition of "let": "[t]o leave or transfer the use of for a consideration; put to rent or hire; farm; lease: often with *out*: as, to *let* a house to a tenant; to *let out* boats or carriages for hire." 3 THE CENTURY DICTIONARY 3419 (1889). However, the Department ignores another contemporaneous definition of the phrase "let out by contract." Although an 1897 dictionary defined "let out" in part as "[t]o lease or demise for rent or other consideration; put to hire or rent," that dictionary also defined "let out" as "[to] grant or assign, as to an applicant; frequently followed by *out*; as to *let* a contract." A STANDARD DICTIONARY OF THE ENGLISH LANGUAGE 1021 (Isaac K. Funk et al. eds., 1897). The 1891 Black's *A Dictionary of Law* also defines the term "let," when used in the context of contracts, to mean "[t]o award to one of several persons, who have submitted proposals therefor, the contract for . . . rendering some . . . service to government for a stipulated compensation." 2 HENRY CAMPBELL BLACK, A DICTIONARY OF LAW 708 (1891).

In addition, numerous contemporaneous cases reveal that courts consistently used the phrase "let out by contract" to refer to the awarding or granting of a contract to a bidder. *See, e.g., Robbins v. City of Chicago*, 71 U.S. (4 Wall.) 657, 666, 18 L. Ed. 427 (1866) ("He may therefore *let out by contract* the building of the house to some person who will undertake to do it." (emphasis added) (quoting *Blake v. Farris*, (1 Selden) 5 N.Y. 48 (1851))); *see also Bibb's Adm'r v. N.&W. R.R.*, 87 Va. 711, 727, 14 S.E. 163 (1891) ("the railway company had *let out by contract*, the building of a viaduct . . . ." (emphasis added)); *Storrs v. City of Utica*, 17 N.Y. 104, 109 (1858) ("Although the work may be *let out by*

*contract*, the [municipal] corporation still remains charged with the care and control of the street . . . ." (emphasis added)). In Washington, this court discussed a code allowing county commissioners to, " 'in their discretion *let out by contract* to the lowest bidder' " work on county roads. *Giffin v. King County*, 50 Wash. 327, 329, 97 P. 230 (1908) (emphasis added) (quoting 1 Bal. Code § 3767 (1897)). Finally, numerous additional cases used language like "let out the contract" to refer to the act of awarding or granting a contract. *See, e.g., Smith v. Wilkes & McDuffie Counties*, 79 Ga. 125, 127, 4 S.E. 20 (1887) ("[The counties] *let out the contract* to the lowest bidder . . . ." (emphasis added)); *Turner Ex-Parte*, 40 Ark. 548, 549 (1883) ("directed the County Court . . . to make an appropriation and proceed to advertise and *let out the contract* for building another Court House" (emphasis added)).

The definition of the term "let out by contract" in these cases is obviously broader than the terms, "sell," "lease," or "rent." In each case, the government entity or company did not sell, lease, or rent a commodity; this definition does not involve compensation that runs to the State. Instead, in each case, the government entity or company granted or awarded a contract to a private entity, under which the private entity would be compensated to perform work or fulfill a need. Because these definitions and contemporaneous judicial opinions reveal the meaning of "let out" that is specifically connected to the phrase "let out by contract" and the concept of contracting, we conclude that this is the meaning that the founders and ratifying public intended to adopt.[5]

The dissent attempts to contort this definition of "let out by contract" to support its theory that article II, section 29

---

[5] When read in accordance with this definition, article II, section 29 states that the labor of convicts shall not be granted or awarded by contract to any private entity. Such a definition is not contrary to the use of the term "let out by contract" in a contemporaneous territorial newspaper, which suggested that the Washington Territory should " 'take [prison labor] in charge instead of *letting it out by contract.*' " *Water Jet* I, 148 Wn.2d at 410 (quoting *Visit to the Territorial Penitentiary*, Lewis County Nugget (Chehalis), Aug. 4, 1883, at 1).

is predicated on the concept that prison labor is a commodity that the State can sell. While the dissent admits that "let out by contract" can mean "to submit the contract out to bid," it then attempts to equate awarding such a contract with selling a government property right. Dissent at 506. However, none of the cases listed above suggest that to "let out by contract" work on a public road or building somehow involves the transfer of a property right in the road or building to a private contractor. In sum, we conclude that the term "let out by contract" in article II, section 29 means to award a contract to a private entity, under which the private entity would be compensated to perform work or fulfill a need. This definition does not involve the sale, rent, or lease of government property, nor does it involve relinquishment of a government property right in exchange for payment.

■■ Most importantly, the language of the first clause of article II, section 29 cannot be interpreted independently; we must consider the provision in its entirety to determine its meaning. The second clause of article II, section 29 explains which systems of convict labor will be allowed. The clause states, "and the legislature shall by law provide for the working of convicts *for the benefit of the state*." CONST. art. II, § 29 (emphasis added). Thus, a reading of the two clauses together reveals that convict labor must be put to use "for the benefit of the state," *rather than* for the benefit of any "person, copartnership, company or corporation." Given the logical relationship between the two clauses of article II, section 29 and the contemporaneous trend toward allowing only public systems of convict labor that profit *only* the State, it seems clear that the founders intended to limit Washington to only the public systems of convict labor.

The dissent interprets the phrase "for the benefit of the state" broadly, as an explanation of the founders' reason for refusing to let the convicts sit idle. The dissent also argues that the founders chose to limit convict labor to that which benefits the State rather than limiting convicts to laboring only for the State. But the historical context surrounding

the adoption of article II, section 29 undercuts any foundation for this interpretation. Such a reading simply does not account for the delegates' desire to limit direct competition with free labor and prohibit state favoritism toward chosen private enterprises. *See infra* part II C. Therefore, we conclude that the founders and ratifying public intended convict labor to profit the State, rather than private enterprise.[6]

## C. *Historical Context*

■■ "In determining the meaning of a constitutional provision, the intent of the framers, and the history of events and proceedings contemporaneous with its adoption may properly be considered." *Yelle*, 55 Wn.2d at 291. Of course, there can be more than one purpose motivating a provision of the state constitution. *See, e.g., State v. Halstien*, 122 Wn.2d 109, 116-17, 857 P.2d 270 (1993). Where history suggests that there was more than one purpose behind a constitutional provision, logic dictates that the provision should be interpreted such that it satisfies each purpose.

■ When contemplating the issue of prison labor, Washington's founders had to balance several concerns, including the brutality associated with the lease system, the corruption and favoritism associated with private convict labor systems, and objections to convict labor's competition with free labor. The historical context surrounding the adoption of article II, section 29 reveals that the founders were particularly mindful of the impact of prison labor on free labor and the problem of favoring one private enterprise over others with the benefit of prison labor. While the Department's interpretation of article II, section

---

[6] Amici, including Private Industries in Prison Association, claim that because article II, section 29 is not located within the Washington Constitution's Declaration of Rights (Article I), it should not be interpreted to protect the interests of free labor or business. We disagree. While article II, section 29 limits the power of the State, we cannot ignore that the founders' intent, in part, was to prevent prison labor from competing directly with free labor.

29 addresses the humane treatment of prisoners, it fails to give proper weight to the founders' other concerns. Indeed, the Department would allow a system that embraces the very pitfalls that Washington's founders were hoping to avoid. We instead recognize that Washington's founders intended to address three concerns when they adopted article II, section 29: they intended to protect free workers from detrimental impacts of inmate labor on the local job market, they intended to protect local businesses from the unfair competition of prison run programs, and they intended to protect inmates from the cruelty of the lease system.

1. *Constitutional Convention*—The most convincing evidence that the impact of prison labor on free labor was a prevailing concern arises from reports of the constitutional convention itself. There is clear evidence that the delegates openly discussed the impact of prison labor on free labor. *Delegates Oppose Leasing the Services of Criminals to Corporations*, THE TACOMA DAILY LEDGER, Aug. 10, 1889, at 4. The *Tacoma Daily Ledger* article reveals the delegates' discomfort with allowing convict labor to be utilized by private entities. Yet it suggests relative support for using convict labor for public works. Referring to the committee members involved in the debate, the article notes, "Mr. Weir was opposed to leasing convict labor, or to bringing pauper labor in competition with honest workingmen." *Id.*; *see also* THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION: 1889, at 545 (Beverly Paulik Rosenow ed., 1999). T.M. Reed "thought convict labor was demoralizing to the laboring classes." LEDGER, *supra*, Aug. 10, 1889, at 4. "Mr. Prosser was also opposed to using convict labor." *Id.* Meanwhile, Mr. Buchanan stated that he "thought the convicts should be used on public works, and so did Mr. Lindsley." THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION: 1889, at 545. At the end of the debate, both clauses of section 29 remained: one forbidding convict labor for the benefit of private entities and the other mandating convict labor for the benefit of the State.

At the convention, President John Hoyt presented a petition from the local labor union requesting that the following provision be included in the constitution: "Convict labor shall not be employed in competition with free labor." *Suggestions from Tacoma*, LEDGER, *supra*, July 18, 1889, at 4. Hoyt shared this request only weeks before committee debates on article II, section 29. Thus, competition with the private sector was undoubtedly in the forefront of the committee members' minds as they entered the debate.

Amici, including Private Industries in Prison Association, claim that because the labor petition was not adopted, we cannot give article II, section 29 the precise meaning the framers refused to adopt. However, it is not surprising that the delegates rejected this provision in favor of the one actually adopted. If not, *all* prison labor would have been prohibited because even the public systems of prison labor compete *indirectly* with free labor industries. *See* FARRELL, *supra*, at 30. Of course, the fact that some delegates wanted prison labor to be used only on public works reveals that article II, section 29 represents a compromise. Article II, section 29 addresses labor concerns by preventing direct competition between prisoners and free laborers for particular jobs, but it does not prevent the sale of prison-made goods in the open market, so long as the goods are produced in a state-run program and profits benefit the State.

2. *Political Climate*—In the years immediately preceding Washington's constitutional convention, the political life of our emerging state was dominated by the populist movement, which strongly influenced Washington's constitution. Hugh Spitzer, *Washington Constitution's Suspicion of Big Business is Built-in*, SEATTLE POST-INTELLIGENCER, Nov. 19, 1997, at A15. Although Washington's Populist Party was not formalized until 1891, support for populist philosophies was strong throughout the 1880s. ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A REFERENCE GUIDE 11 (2002). By 1889, "a wave of populism lapped against the shores of Olympia as the constitution was drafted." *Southcenter Joint Venture v. Nat'l Democratic*

*Policy Comm.*, 113 Wn.2d 413, 445, 780 P.2d 1282 (1989) (Utter, J., concurring).

Populism sprang primarily from agrarian roots and emphasized a philosophy of protection for small businesses and the working citizen. *Id.* Central among the populist ideals was the protection of the individual from unfair advantages created by coalitions between big government and politically connected big businesses. *See generally* James M. Dolliver, *Condemnation, Credit, and Corporations in Washington: 100 Years of Judicial Decisions—Have the Framers' Views Been Followed?*, 12 U. PUGET SOUND L. REV. 163 (1989). "The populists wished to protect personal, political, and economic rights from both the government and [big] corporations, and they strove to place strict limitations on the powers of both." Robert F. Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 U. PUGET SOUND L. REV. 491, 519 (1984). To achieve this, the populists strove to erect a "fire wall between the public and private sectors." Hugh Spitzer, *Washington's Constitution and How It Affects Us*, SEATTLE POST-INTELLIGENCER, Nov. 16, 1997, at E1. It was with this mindset that the framers drafted article II, section 29. Robert F. Utter, *The Right to Speak, Write, and Publish Freely: State Constitutional Protection Against Private Abridgment*, 8 U. PUGET SOUND L. REV. 157, 178 (1985).

The national context in which Washington's populists were developing provided plentiful ammunition for a position that government should resist entanglement with private business. J.P. Morgan, John Rockefeller, and Andrew Carnegie had emerged as titans, and along with them came the perception that big business had somehow usurped government. MICHAEL KAZIN, THE POPULIST PERSUASION 31, 41-42 (1995). National scandals in the 1870s like Credit Mobilier, Whiskey Ring, and the Belknap scandal, all of which involved entrepreneurs who abused political connections, would have added to the founders' populist sentiments. *See* RICHARD HOFSTADTER, THE AGE OF REFORM

71-75 (1955); 2 Thomas A. Bailey, David M. Kennedy & Lizabeth Cohen, The American Pageant, A History of the Republic 514-15 (11th ed. 1998). Credit dependent and cash starved farmers blamed big business and the railroads for their financial difficulties. Kazin, *supra*, at 38. Labor unions were all too aware that businesses relied on government to put down strikes. *Id.* The populist movement was, in part, an attempt to strengthen government and restore its control to the people. *Id.* at 41-42. As a result, it would seem Washington's populists must have meant "for the benefit of the state" to mean that prison labor could not be used to benefit private industry.

3. *Labor Movement*—Meanwhile, at a national level, the labor movement's objections to convict labor were developing momentum. Although prison labor was heavily utilized throughout the nineteenth century, labor and business interests began to lobby against it in the 1880s and 1890s, claiming that "prison workers and the businesses that employed them had unfair advantages." Brian Hauck, *Prison Labor*, 37 Harv. J. on Legis. 279, 281 (2000) (referencing Prison Industry Enhancement Certification Program Guideline, 64 Fed. Reg. 17,000, 17,001 (Apr. 7, 1999)); *see also* Farrell, *supra,* at 98. Industry and an increasingly organized labor movement began to object to the sale of prison goods in the free market. A work on prisons published just three years before the adoption of our constitution states: "[T]he objection to convict labor, as now managed in most prisons, is that it is contracted out at such figures that the honest free laborers are reduced to starvation in the necessary competition which ensues . . . ." John P. Altgeld, Our Penal Machinery and Its Victims 111 (1886). At its first convention, the National Labor Union, a precursor to the Knights of Labor, advocated for a system of convict labor " 'which will least conflict with honest industry outside the prisons.' " Farrell, *supra,* at 98. Thus, by the time the Washington State Constitutional Convention convened, convict labor had become increasingly controversial because of its impact on free labor. *Id.*

As a result, labor interests exerted a powerful influence over the creation and amendment of state convict labor provisions. FARRELL, *supra*, at 98-99. "The long-term and sustained efforts of free laborers and manufacturers, rather than the concerns of convict exploitation, led to the eventual abolition of private sector involvement in prison industry." Misrahi, *supra*, at 417; *see also* Garvey, *supra*, at 342 ("Prison labor disappeared primarily because organized labor unions and business organizations wanted to eliminate the competition."). The state-use system, which "obviate[d] the objections of free labor and of manufacturers," came into prominence in the 1880s upon the decline of the contract system. FARRELL, *supra*, at 32.

In Washington, the 1880s were times of serious social upheaval, including labor unrest, as railroad expansion led to rapid urbanization and a population explosion. UTTER & SPITZER, *supra*, at 11. After the railroad's completion, wide scale unemployment generated additional tensions. MARY W. AVERY, HISTORY AND GOVERNMENT OF THE STATE OF WASHINGTON 197 (1961). The Knights of Labor gained considerable local popular support, and its People's Party won the Seattle mayoral election in 1886. *Id.* at 196. In the late 1880s, serious clashes between mine owners' private armies and mine workers in the Cascade coal fields ensured that labor issues influenced debate at the constitutional convention. CARLOS A. SCHWANTES, RADICAL HERITAGE: LABOR, SOCIALISM, AND REFORM IN WASHINGTON AND BRITISH COLUMBIA, 1885-1917, at 32 (1979). Two members of the convention directly represented labor: Matt J. M'Elroy, a logger, and William L. Newton, a coal miner. *Id.* One historian credits the two prolabor provisions—article II, section 29 and article I, section 24 (forbidding corporations from employing armed bodies of men)—directly to labor influence. *Id.* The additional impact of labor concerns upon the adoption of article II, section 29 is evidenced by the fact that the delegates to the constitutional convention openly discussed the impact of convict labor on free labor. *See supra* part II C 1.

4. *History of the Washington Prison System*—The populist distrust of government entanglement with private enter-

prise was likely enhanced by the experience of the Washington Territory's early prison labor systems. The Washington Territory originally housed its prisoners in county jails. Wash. State Dep't. of Inst., *State Prison: A History of Adult Corrections in Washington*, PERSPECTIVE, Spring-Summer 1966, at 5 (hereinafter *State Prison*). However, the legislature soon recognized the need to provide a central facility and entered into a contract with William Billings, the sheriff of Thurston County, to take custody of all of the convicts in one location. *Id.* at 6. Billings agreed to build a territorial prison in exchange for a maintenance allowance for each convict and the right to use their labor. *Id.* Under Billings' supervision, the convicts worked at logging, coal mining, and barrel-making. *Id.* at 7. There was criticism of the Billings contract at the outset because the territorial legislature had conferred " 'a special privilege to the fullest extent.' " *Water Jet* I, 148 Wn.2d at 414 (quoting *In a Quandary*, WASHINGTON STANDARD (Olympia), Nov. 24, 1877, at 1). Indeed, the contract proved to be quite profitable for Billings and his associates. *State Prison*, *supra*, at 7. They enjoyed large profits as a result of their contract with the State, a contract which was granted to them at least in part because of their political influence. *Id.* at 6. Moreover, there is some suggestion that Billings failed to pay the territorial government its share of the convicts' wages. UTTER & SPITZER, *supra*, at 67.

In 1886, the territorial government decided to abandon the Billings contract and the "free enterprise" prison system and take over the supervision of prisoners itself. *State Prison, supra*, at 7. The territorial government then built a new penitentiary in Walla Walla to be managed by the State. *Id.*; *see also* MESSAGES OF THE GOVERNORS OF THE TERRITORY OF WASHINGTON TO THE LEGISLATIVE ASSEMBLY, 1854-1889, at 250 (Charles M. Gates ed., 1940).

Territory officials recognized the need to provide work for the convicts and defray the costs of the penitentiary, while also striving to prevent competition with free labor and state favoritism of one private enterprise over another. The prisoners at the Walla Walla penitentiary were first put to

work making bricks for the State. *State Prison, supra*, at 11. The commissioners later recommended expanding the prison's brick-making enterprise because, among other reasons, "no industry or institution would be materially injured thereby." *The Walla Walla Prison: The Commissionrs' Report to the Governor*, THE TACOMA DAILY LEDGER, Nov. 27, 1889, at 2 (hereinafter *Commissioners' Report*). An 1887 superintendent's report to the territorial governor discussed the need to provide work for the convicts in his care and suggested burlap bag manufacturing, by way of a state-run jute mill, because it "would in no [sic] come in compettiion [sic] with any local enterprise." WASHINGTON STATE PENITENTIARY, SUPERINTENDENT'S REPORT TO THE GOVERNOR AND LEGISLATIVE ASSEMBLY OF WASHINGTON TERRITORY 8 (Supp. 1887). Furthermore, a letter from the commissioners of the Walla Walla penitentiary states that "we at once took into consideration the best means of employing the convicts to the benefit of the penitentiary, and at the same time not injure local industries." *Commissioners' Report, supra*, at 1. Although territory officials recognized the need to provide some sort of work for convicts, they were also hesitant to provide work that might compete directly with local businesses and free labor.

In the years immediately following the adoption of article II, section 29, state officials continued to limit prison labor to public, rather than private systems. In 1891, Acting Governor Charles Laughton himself recommended to the legislature that the State establish a jute bag factory in the Walla Walla penitentiary. Governor Laughton wanted "constant employment [to] be furnished to prisoners" for the purpose of reducing the net cost of the penitentiary while benefiting the prisoners themselves. State of Wash., Gov. Chas. E. Laughton, *Message to the Legislature*, at 45 (1891). Governor Laughton assured that:

> The Penitentiary is situated in the center of one of the richest grain-producing regions in the United States, if not in the whole world, where the labor of the convicts for the purposes suggested would in no wise enter into competition with the free labor of the citizen.

*Id.* Laughton subsequently submitted to the legislature several reports from Washington prison commissioners analyzing the feasibility of a jute bag factory. Letter from Governor Laughton to the President of the Senate (Jan. 28, 1891) (accompanying the SUPPLEMENTAL REPORT OF PRISON COMMISSIONERS 1891). Those reports reflected the success of a comparable prison factory in California. SUPPLEMENTAL REPORT OF PRISON COMMISSIONERS, *supra*, at 15-16 (quoting Letter from Warden's Office, State Prison, San Quentin, Cal., (July 12, 1890)). The reports took care to note that jute bags were currently obtained only from East India or Scotland. *Id.* at 15. In fact, the California prison directors also chose the jute bag factory "because of its non-competition with free white labor." *Id.* at 16.

Therefore, the impact on free labor remained a constant concern, and when developing a labor system at the Walla Walla prison, early state officials acted as if article II, section 29 prohibited all private systems of prison labor. Although the 1927 and 1943 legislatures interpreted article II, section 29 to prohibit the contract system of labor, *Water Jet* I, 148 Wn.2d at 423-24, the actions of Washington's officials immediately after the adoption of article II, section 29 are undoubtedly more reflective of the founders' meaning.

5. *Conclusions*—While we agree with the Department that Washington's founders would not have contemplated a system identical to the Class I Free Venture Industries system, it is evident that the delegates intended (1) to prevent prison labor from displacing free labor, and (2) to prevent the State from favoring one business over another with the benefits of inmate labor when they adopted article II, section 29. The plain language of article II, section 29 reflects that labor for the benefit of the State is mandated, while labor for the benefit of a private enterprise is prohibited. If indeed the delegates also intended to mandate a humane prison labor system, that problem was also solved because article II, section 29 allowed only state control over prison working conditions.

However, reading article II, section 29 to outlaw only the contract and lease systems of convict labor, as the Department suggests, does not protect against the very shortcomings that Washington's founders were trying to avoid. The Department's interpretation allows private enterprise to choose prison labor over free labor. It also allows the State to favor one private entity over its competitors with the benefits of prison labor. These are the very problems that Washington's founders intended to protect against when they adopted article II, section 29.

### D. *Other States' Interpretations of Similar Constitutional Provisions*

Because Washington courts have not previously interpreted article II, section 29, it is appropriate to turn to other states with similar constitutional provisions for guidance. *See Waremart, Inc. v. Progressive Campaigns, Inc.*, 139 Wn.2d 623, 638-39, 989 P.2d 524 (1999). The cases in this section are particularly instructive because they interpret constitutional language that served as a basis for, or is nearly identical to, our own.

1. *California*—The California State Constitution provides: " 'The labor of convicts shall not be let out by contract to any person, copartnership, company or corporation, and the Legislature shall, by law, provide for the working of convicts for the benefit of the State.' " *Pitts v. Reagan*, 14 Cal. App. 3d 112, 115, 92 Cal. Rptr. 27 (1971) (quoting CAL. CONST. art. X, § 1 (formerly art. X, § 6, *repealed* 1960)). In addition to the parity in language, legal scholars have recognized the influence California's constitution had in the formation of Washington's constitution. *See* Dolliver, *supra*, at 170 (citing ARTHUR S. BEARDSLEY, SOURCES OF THE WASHINGTON STATE CONSTITUTION, *reprinted in* 1987-88 WASHINGTON LEGISLATIVE MANUAL 362 (1987)). California's constitutional convention was held only a decade prior to Washington's, in a similar political climate where a strikingly similar debate arose. *See Pitts*, 14 Cal. App. 3d at 118. For example, when

a motion was made to strike the language, " '[t]he labor of convicts shall not be let out by contract to any person, copartnership, company or corporation,' " several representatives spoke in favor of its retention: " '[i]t is a burden upon free laborers for the State to contract the labor of these prisoners' "; "a very great evil is that 'it brings this prison labor in competition with free white labor' "; and " '[t]he interests of the laboring classes are directly in conflict with the interest of those who employ contract labor.' " *Id.* at 118-19 (quoting Delegates Condon, Freud, and Beerstecher). The comments from Washington delegates echoed these same sentiments only 10 years later. California's interpretation of its article X, section 1 is therefore instructive when interpreting our article II, section 29.

In *Pitts*, the California court of appeals interpreted the effect of its constitution's convict labor clause on an "Emergency Harvest Program," under which convict labor was used for harvesting privately owned crops during periods of alleged labor shortages. *Id.* at 114-15. The court concluded, "[T]he instant language of article X, section 1, is intended in the broader sense—that the state may not let out convict labor by contract to private employers regardless of whether the state or the convicts or both receive the attendant consideration." *Id.* at 117-18. It did not matter to the court whether the convicts consented or that they were paid "going wages." *Id.* at 118. Rather, the court was concerned with the *competition* with the private sector that the use of convict labor presented, stating:

> Little imagination is required to visualize the effects of convicts in this manner competing in the state's labor market. And there would seem little doubt that the terse words of article X, section 1, "The labor of convicts shall not be let out by contract" to private persons were not intended to allow such a practice.

*Id.* at 118.

The dissent argues that the *Pitts* court invalidated the labor program at issue because there were no contracts between the growers and the prisoners, only between the growers and the State. Although the *Pitts* court noted that

"[t]here were no individual contracts between the growers and the prisoners," *id.* at 116, there is no indication that this was the basis for its holding. Furthermore, the dissent implies that because the *Pitts* court stated that a "convict may himself sell or hire out his services to a private person," *id.* at 117, the court would have validated our Class I industries. However, this ignores the critical problem recognized by the *Pitts* court, namely that there was a contract between the State and private entities, just as there must be in our Class I industries program. The *Pitts* court defined the issue before it as "whether the state, without profit or consideration to itself, is permitted by article X, section 1, to furnish convict labor to private individuals or organizations under contract or other agreement." *Id.* There is no indication in that statement that the court was particularly concerned with whether there were contracts between the convicts and the private enterprise. In addition, the California court held that the Emergency Harvest Program violated article X, section 1, despite the fact that California did not sell, lease, or rent convict labor. Therefore, the *Pitts* opinion clearly does not support the Department's interpretation of the phrase "let out by contract."

The facts of *Pitts* are quite similar to those before us. In both instances, prison labor is being utilized by a private industry by virtue of a contract with the State. In fact, allowing prisoners to harvest fruit during a labor shortage is arguably more beneficial to the State than the MicroJet contract at issue here. Given the closeness in the timing of the adoption of our states' constitutions and the nearly identical language of the provisions, the California court's conclusion is particularly persuasive.

A 1980 California attorney general opinion discussed whether California's work furlough system was prohibited by the section of the California Constitution interpreted in *Pitts*. The opinion concluded that California's furlough system was permissible because "the state is not providing the labor by contract with the employer." 63 Ops. Cal. Att'y

Gen. No. 79-1016, at 33, 36 (1980). Under the California system, the work furlough administrator does not contract for the prisoner's employment, he merely assists in finding employment for the prisoner. *Id.* Of course, Washington's Class I Free Venture Industries system is critically different from California's furlough system. RCW 72.09.100(1). Here, the State does not merely help the prisoner to find employment in the open job market; it contracts with a private enterprise to manufacture its product within the prison and to employ prisoners. Therefore, the California attorney general's opinion does not contradict our conclusion that the State cannot grant the benefit of prison labor by contract.

2. *Illinois*—A similar provision in the Illinois Constitution mirrors our own. Beardsley, *supra*, at 376. In fact, when drafting article II, section 29, Washington delegates were particularly influenced by the Illinois Constitution. *Bond v. Burrows*, 103 Wn.2d 153, 157-58, 690 P.2d 1168 (1984); Journal of the Washington State Constitutional Convention, *supra*, at 545 n.53 (citing Ill. Const. 1870 (Amendment of 1886)); Beardsley, *supra*, at 376. The fourth amendment to the Illinois State Constitution states, " 'Hereinafter it shall be unlawful for the commissioners of any penitentiary, or other reformatory institution in the State of Illinois, to let by contract to any person, or persons, or corporations, the labor of any convict confined within said institution.' " *K.&S. Mfg. Co. v. Illinois*, 7 Ill. Ct. Cl. 107, 108-09 (1932) (quoting Ill. Const. amend. 4). This amendment became effective in 1886 after organized labor staged a successful boycott of prison-made goods, echoing labor influence in Washington during the time of our constitutional convention. *See* Blake McKelvey, *The Prison Labor Problem: 1875-1900*, 25 J. Am. Inst. Crim. L. & Criminology 254, 256 n.6 (1934).

In 1903, Illinois enacted legislation that reflected the language of its constitution, but permitted prisoners to work under certain conditions. *See K.&S. Mfg.*, 7 Ill. Ct. Cl. at 110. Section 5 of the 1903 Illinois Act to Regulate the

Employment of Convicts and Prisoners provided that the board of prison industries,

"shall not . . . make any contract by which the labor or time of any prisoner or convict in any penitentiary or reformatory of this State or the product or profit of his work shall be contracted, let, farmed out, given or sold to any person, firm, association or corporation; except that said prisoners or convicts in said penal or reformatory institutions may work for, and the products of their labor may be disposed of to the State, or for or to any public institution owned or managed and controlled by the State."

*Id.* (quoting 1903 Act, § 5, *repealed by* 730 ILL. COMP. STAT. 5/8-5-1 (Jan. 1, 1973)). This section resembles the "public benefit" clause of article II, section 29 of the Washington State Constitution and thus sheds additional light on the interpretation of our own provision.

In *K.&S. Manufacturing*, a manufacturing company sought damages arising from a contract with the department of public welfare for the manufacture of furniture at the Stateville prison. 7 Ill. Ct. Cl. at 107-08. Upon interpreting the fourth amendment to the Illinois Constitution, the state court of claims[7] responded: "[t]he language of this provision is plain, and its purpose can not be misunderstood. It was intended to prevent prison labor from entering into competition with free labor." *Id.* at 109. The court unequivocally recognized: "Any contract the effect of which is to let the labor of the prisoners is in violation of this clause of the Constitution and wholly void, and no cause of action can be based upon it." *Id.*

Supplementing its interpretation of the fourth amendment, the Illinois court found the 1903 law to be "in

---

[7] The Illinois Court of Claims has exclusive jurisdiction over most claims against the State. The court consists of judges and a chief justice appointed by the governor and confirmed by the senate. 2000 Illinois Court of Claims Rules and Statutes, Summary of Jurisdiction at iv; *see also* Illinois Court of Claims, Judges & Commissioners, *available at* www.sos.state.il.us./departments/court_of_claims/judges.html (last visited Apr. 30, 2004). Therefore, the court's interpretation of similar Illinois law, while by no means dispositive, can be instructive in our interpretation of article II, section 29.

harmony with the letter and spirit of the fourth amendment to the Constitution." *Id.* at 111. Thus, convict labor could permissibly be used for the benefit of the State, so long as prison labor did not compete with the private market:

> It is clear . . . that the intention of the legislature was to prevent the competition of prison labor with free labor; that it intended the prisoners should be employed in such work and in the manufacture of such articles as could be used by the State, the institutions of the State and the school and road districts of the State so that the products of their labor would not enter into [sic] goods sold on the open market to the general public.

*Id.* As with the *Pitts* case from California, the Illinois court's reasoning is persuasive and supports our conclusion that the Department's program, though legislatively authorized, violates the Washington Constitution.

3. *Other States*—The Department cites case law from New York, Utah, and Oklahoma to support its contention that Washington's article II, section 29 prohibits *only* the contract system of prison labor because, under the Department's reasoning, the term "let out by contract" refers only to the practice of selling, renting, or leasing the labor of prisoners. In addition, the dissent cites to other cases for the proposition that article II, section 29 only prohibits the State from selling, renting, or leasing convict labor. However, it is clear that none of these cases interprets language like article II, section 29's to mean that the State can grant the benefit of convict labor to a private enterprise. In fact, several of the sources cited reflect a preference, if not a mandate, for the public systems of prison labor.

The Department cites *People v. Hawkins*, 157 N.Y. 1, 51 N.E. 257 (1898). The *Hawkins* court interpreted the New York Constitution to allow convict-made goods to be sold to the general public, so long as convict labor is not " 'farmed out, contracted, given or sold to any person, firm, association or corporation.' " *Id.* at 12 (quoting N.Y. CONST. 1894, art. 3, § 29). Although the court noted that the constitution "simply abolished . . . the contract system of labor in prisons," it did so because "the profits of the labor of convicts

were secured by contractors or private parties." *Id.* at 13. Therefore, the *Hawkins* court recognized that goods made in a state-run prison labor system could be sold to the general public because the profit would benefit the State, rather than private enterprise.

The Department also cites *Utah Manufactures' Ass'n v. Mabey*, 63 Utah 374, 226 P. 189 (1924), claiming that the Utah Supreme Court clearly understood "contracting" to mean the contract system of convict labor. However, the Utah court has clearly drawn a distinction between permissible state-run labor programs and impermissible private systems. In *Utah Manufacturers'*, the court concluded that a *state-run* program did not have "any of the elements of 'contracting convict labor,'" and therefore did not violate Utah's constitution. 226 P. at 189. The *Utah Manufacturers'* court distinguished a case that had been decided the year before involving a convict work program in which a private company provided the materials, machinery, and supervision while the prison provided the labor of the convicts, the manufacturing space, and the utilities. *Id.* at 189-90 (discussing *Price v. Mabey*, 62 Utah 196, 218 P. 724 (1923)). The *Price* court invalidated that program, finding that it was "in its essence a contract for the hiring of prison labor." *Price*, 218 P. at 727. The holdings in *Utah Manufacturers'* and *Price* thus do not conflict with our holding today.

The Department also refers to *Rice v. State*, 1924 OK 1112, 108 Okla. 4, 232 P. 807, which involved a shirt factory within a penitentiary that was operated by the State. The Department maintains that *Rice* rejected only the lease and contract systems of labor. However, like *Utah Manufacturers'*, this case concerned whether or not the state-run business was for public, rather than private, purposes. 232 P. at 810. The court merely addressed whether convict-made goods could be sold on the open market, even though they might compete indirectly with goods produced by free labor. The *Rice* court found that the state-run program was constitutional, stating:

[I]t is necessary that those confined be employed . . . . The fact that such employment may produce a commodity to be sold on the market in competition with goods produced by free labor *does not render the purpose a private one.*

*The state is entitled to the labor and service of its convicts* while confined in its prisons, and has the authority to produce by such labor things of commercial value.

*Id.* at 810 (emphasis added). Thus, the *Rice* court in no way endorsed prison labor programs that would benefit private enterprise or compete with free laborers. *See also Sibel v. State Bd. of Pub. Affairs*, 1952 OK 196, 206 Okla. 433, 244 P.2d 307, 308 (authorizing the construction of a bookbinding facility within a state penitentiary, to be used only " 'by departments, institutions and agencies of the State and its political subdivisions.' " (quoting OKLA. STAT. Tit. 74, § 123 (1951))).

Thus, the Department seems to ignore the ultimate holdings of *Hawkins, Utah Manufacturers'*, and *Rice*, asserting that the cases support prohibition of *only* the contract system of convict labor. In contrast, these cases all reflect that, as long as a prison work program is one of the *public* systems, the applicable state constitutional provisions do not prohibit them.

Some of the additional cases cited by the dissent merely refer to, define, or describe specific contracts or the contract system of labor in general. *See, e.g., Nugent v. State of Ariz. Improvement Co.*, 173 U.S. 338, 338-42, 19 S. Ct. 461, 43 L. Ed. 721 (1899)). Others establish only that prisoners were not parties to contracts between states and private enterprises under the contract system of labor. *See, e.g., Thompson v. Bronk*, 126 Mich. 455, 85 N.W. 1084 (1901). Because the characteristics of the contract system are not disputed, the relevance of these cases is questionable. The relevance of *Walton County v. Franklin*, 95 Ga. 538, 538, 22 S.E. 279 (1894) is also in doubt because the *Franklin* court merely noted that county authorities could no longer hire out convicts to a private individual, without discussion of the relevant statutory language.

However, several of the cases cited by the dissent actually reflect the trend that states were beginning to allow only public systems of prison labor, while prohibiting private systems. These cases would not conflict with our reading of article II, section 29. *See, e.g., State ex rel. Davis v. Mortensen*, 69 Neb. 376, 384, 95 N.W. 831 (1903) (noting Nebraska's plan to "eventually provide means for the employment of all prisoners without the intervention of contractors"); *Ove Gnatt Co. v. Jackson*, 205 Ind. 51, 56, 184 N.E. 553 (1933) (Treanor, J.) (allowing goods produced on a state run farm to be sold on the open market and noting "[i]t has also been the policy of the General Assembly to abolish contract labor . . . *and to substitute therefor the manufacture of goods on state account*." (Emphasis added.)); *State ex rel. Greaves v. Henry*, 87 Miss. 125, 40 So. 152, 155-56, 159 (1906) (noting that the Mississippi Constitution allowed inmates to work on public works projects or on state-run farms but only under state supervision).

In sum, the California and Illinois courts have interpreted comparable constitutional provisions to prohibit private systems of convict labor that benefit private enterprise. The holdings from New York, Utah, Oklahoma, and other states are not in conflict because they do not speak to a prohibition comparable to the one adopted in Washington, or they allow public, rather than private, systems to continue in those states.

## III

### Application of Article II, Section 29 to the Class I Free Venture Industries Program

 ██ We must evaluate the Class I Free Venture Industries program in light of the plain meaning of article II, section 29 and the purposes motivating its adoption. Under the Class I program, the benefit of prison labor is granted to a private enterprise by virtue of a contract with the State. RCW 72.09.100(1). Although the prisoners work voluntarily under contracts like MicroJet's, they may not

freely choose to work instead for one of MicroJet's competitors. The company enjoys additional benefits, including a rent-free facility and significantly reduced overhead costs. Most importantly, the prison workers are employed in positions that companies like MicroJet would otherwise have to fill with free workers. Thus, the Class I program engenders the exact problems that Washington's founders intended to avoid by adopting article II, section 29.

Ultimately, the Class I system lets out prison labor by contract for the benefit of a private company or corporation in direct contravention of article II, section 29. RCW 72.09.100(1) unconstitutionally endorses this private system of convict labor. Because RCW 72.09.100(1) is itself unconstitutional, deference to the legislature cannot save it.

The benefits of providing employment opportunities for convicts are not in dispute. Even though Class I industries are unconstitutional, there remain four valid classes of inmate work programs under RCW 72.09.100(2)-(5),[8] which are clearly state operated systems. Work release programs as established in chapter 72.65 RCW also remain.[9] The Class I industries program at issue in this case is different from all of these permissible programs because Class I involves a contract for convict labor between a private enterprise and the State, for the benefit of the private enterprise. Therefore, we overrule *Water Jet I*, 148 Wn.2d 403, to the extent that it is inconsistent with this opinion.

---

[8] The four additional inmate work programs are Class II: Tax Reduction Industries, RCW 72.09.100(2); Class III: Institutional Support Industries, RCW 72.09.100(3); Class IV: Community Work Industries, RCW 72.09.100(4); Class V: Community Restitution Programs, RCW 72.09.100(5). All of these programs must be operated by or under the supervision of the Department and therefore do not run afoul of our constitution.

[9] The work release program is also distinguishable because work release residents are not limited to a single employer within a particular industry; they must find work in the open labor market.

IV

Claims Against Kenneth and Sharon Piel

Water Jet also named the owners of MicroJet, Kenneth and Sharon Piel, as defendants, although it did not claim a specific wrongdoing against the Piels. These claims were involuntarily dismissed by the trial court. Water Jet had an opportunity to submit facts that would show that the corporate form had been abused and that disregarding the corporate entity was justified. It failed to do so.

■■ ■■ To pierce the corporate veil and reach the Piels, Water Jet must demonstrate that the corporate form was used to violate or evade a duty, and that it must be disregarded to prevent loss to an innocent party. *Meisel v. M&N Modern Hydraulic Press Co.*, 97 Wn.2d 403, 409-10, 645 P.2d 689 (1982). Courts in other states have dismissed similar arguments on a motion to dismiss for failure to state a claim. *See First Realvest, Inc. v. Avery Builders, Inc.*, 410 Pa. Super. 572, 600 A.2d 601, 604 (1991). We conclude that dismissal was appropriate here as well.

V

Conclusion

Upon reconsideration, we are constrained to conclude that RCW 72.09.100(1) directly conflicts with article II, section 29 of the Washington Constitution. However, we emphasize that the laudable public policy goals that prompted the legislature to adopt RCW 72.09.100(1) can be met through alternative, state-run programs. We also conclude that the trial court's dismissal of the claims against the Piels was appropriate. We affirm *Water Jet* I's dismissal of the plaintiffs' claims based on the Ashurst-Sumners Act, 18 U.S.C. § 1761, and 42 U.S.C § 1983. *Water Jet* I, 148 Wn.2d at 427. In sum, we overrule *Water Jet* I, 148 Wn.2d 403, to the extent that it is inconsistent with this opinion

and remand to the trial court for further proceedings consistent with this opinion.

ALEXANDER, C.J.; JOHNSON and MADSEN, JJ.; and KATO, J. Pro Tem., concur.

CHAMBERS, J. (dissenting) — After due deliberation, our founders renounced a significant commodity: the State's historical power to *sell* the involuntary labor of prisoners on the open market. Today, we must decide whether our founders incidentally prohibited prisoners from entering into *employment relationships* with private entities, a labor relationship unheard of in the nineteenth century. Because we conclude that article II, section 29 of the Washington Constitution did not contemplate, let alone forbid, *private employment* of prisoners, we dissent.

## ANALYSIS

History is critical to our analysis because we interpret constitutional terms as they would have been commonly understood at the time of their promulgation. *See State v. Brunn*, 22 Wn.2d 120, 139, 154 P.2d 826 (1945); *State ex rel. Pub. Util. Dist. No. 1 of Skagit County v. Wylie*, 28 Wn.2d 113, 127, 182 P.2d 706 (1947). Our initial task is to determine how "let out by contract" would have been understood in 1889. The majority canvasses the dictionary definitions, and briefly surveys the different modes of convict labor in the late nineteenth century. While scholarly, the majority overlooks a key historical fact: the founders did not consider the prisoners' right to contract *privately* for their own labor because, at the time, prisoners had no legal capacity to so contract. Under the prevailing law of the time, the State itself owned the prisoners' labor. *See* E. STAGG WHITIN, PENAL SERVITUDE i (1912) ("The State has a *property right* in the labor of the prisoner. . . . This property right the state may lease or retain for its own use, the manner being set forth in state constitutions and acts of legislatures." (emphasis added)). This property right in the labor of prisoners, now

largely abandoned by the march of history, *cf.* U.S. Const. amend. XIII, lay underneath each of the five models of prison labor properly cataloged, but not properly contextualized, by the majority.

The majority surveys many contemporary definitions of the terms of article II, section 29. Again, properly read, underlying all of these definitions is the principle that "to let out by contract," historically, referred to a contractual mechanism, however labeled, whereby some commodity, service, or project controlled by one entity would be contracted to another. As the majority notes, one contemporaneous dictionary defined "let" in part as "[t]o lease or demise for rent or other consideration; put to hire or rent; grant or assign, as to an applicant; frequently followed by *out*; as to *let* a contract." A STANDARD DICTIONARY OF THE ENGLISH LANGUAGE 1021 (Issac K. Funk et al. eds., 1897); *see also* majority at 481.[10] Properly read, this definition is in accord with the historical fact underlying article II, section 29.

While our language has changed somewhat over the last 100 years, to "let out" an apartment is still to rent an apartment. *E.g.*, *Cole v. McKey*, 66 Wis. 500, 29 N.W. 279, 281 (1886) ("the defendant *let out* his house, in apartments, to several tenants" (emphasis added)); *see also Gowen v. Phila. Exch. Co.*, 1843 WL 5003, at *3, 5 Watts & Serg. 141 (Pa.) ("Its apartments are *let* for balls, concerts, lectures, auctions, exhibitions, and other purposes . . . ." (emphasis added)).

---

[10] Other historical dictionary definitions are in accord. One defines "let" as: "To grant possession and use for a compensation; to lease; as, to *let* an estate for a year; to *let* a room for lodgers;—*often followed by out*." NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 766 (Chancey A. Goodrich & Noah Porter eds., rev. ed. 1899) (emphasis added); *accord* NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 659 (Chancey A. Goodrich ed., rev. ed. 1853) ("To lease; to grant possession and use for a compensation; as, to *let* to farm; to *let* an estate for a year; to *let* a room to lodgers; often followed by *out*, as, to *let out* a farm."). Another defines "let" in this context as " '[t]o award to one of several persons, who have submitted proposals therefor, the contract for . . . rendering some . . . service to government for a stipulated compensation.' " Majority at 481 (quoting 2 HENRY CAMPBELL BLACK, A DICTIONARY OF LAW 708 (1891)).

Similarly, to "let out" a contract to build a road is to submit the contract out to bid, *see, e.g.*, majority at 482 (citing *Giffin v. King County*, 50 Wash. 327, 329, 97 P. 230 (1908)), just as to "let out" a contract to build a university building is to submit that contract out for bid, RCW 28B.20.140 (originally enacted by LAWS OF 1909, ch. 97, § 9).

And to "let out" the labor of convicts by contract is to sell, lease, rent, or contract out the State's property right in convict labor to a private party. CONST. art. II, § 29. The majority cites sound sources. It draws the wrong conclusion from them.

The majority's conclusion that "for the benefit of the state" means something is correct. Majority at 483. The majority's implied holding that it means that no entity *but* the state government may benefit from convict labor is unsupported. The 1899 dictionary definition of "benefit" is quite broad: "Whatever contributes to promote prosperity and personal happiness, or adds value to property; advantage: profit." NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 125 (Chancey A. Goodrich & Noah Porter eds., rev. ed. 1899). By the time of our constitutional convention, "it had become recognized, and was so recognized by all students interested in the reformation of prisoners, that regular labor of some kind was necessary and essential for order within the prison walls." *Utah Mfrs.' Ass'n v. Mabey*, 63 Utah 374, 226 P. 189, 189 (1924). Put another way, it was recognized that work itself would benefit the State. This benefit "cannot be estimated in dollars and cents as is shown by all the best penologists of the day." State of Wash., *Annual Report of the Penitentiary Commissioners* 4 (1890) (reviewing the benefit to the State of prison labor). Providing useful work benefits the State through reducing the cost of corrections, providing useful skills, and, as recognized from the earliest days of our State, providing "great benefit from a mental, moral and physical standpoint." State of Wash., Gov. Chas. E. Laughton, *Message to the Washington Legislature* 45 (1891).

The majority holds that "it seems clear" that article II, section 29 was "intended to limit Washington to only the public systems of convict labor." Majority at 483. We disagree. There is considerable evidence that article II, section 29 was a compromise struck by our founders (like those negotiated across the nation at the time) between different interest groups to ameliorate the "antecedent mischief" of convict contract labor. Although some did believe that the problem with convict contract labor was unfair competition, *see Convict Labor, Delegates Oppose Leasing the Services of Criminals to Corporations*, THE TACOMA DAILY LEDGER, Aug. 10, 1889, at 4 (*available in* 4 WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889: CONTEMPORARY NEWSPAPER ARTICLES 4-85 (Penny A. Hazelton ed., 1998)), others believed the problem was the government and the corporate corruption it caused. *E.g.*, WHITIN, *supra*, at 6; JAMES LEONARD FITTS, THE WASHINGTON CONVENTION OF 1889, at 95 (1951). Yet others abhorred the inhumane conditions that often accompanied this form of forced labor. *See generally* NEIL B. CORCORAN, BUCODA—A HERITAGE OF SAWDUST AND LEG IRONS 24-26 (1976); *The Penitentiary*, SEATTLE WEEKLY CHRONICLE, Oct. 4, 1883, at 4 (criticizing the contract system at an early Washington prison as "system wrong in principle, and doubly so in practice. It opens the door for the entrance of personal greed of gain, cruelty and neglect of men so kept."); *see also* UNITED STATES INDUSTRIAL COMMISSION, REPORT OF THE INDUSTRIAL COMMISSION ON PRISON LABOR 6-8 (1900) (hereinafter REPORT ON PRISON LABOR).

Against this backdrop of considerable antecedent mischief wreaked by convict contract labor, our constitutional convention reached a compromise. It declared that "[T]he labor of convicts of this state shall not be let out by contract." CONST. art. II, § 29. It forbade the State from selling the commodity of contract labor and provided that convicts should work for the benefit of the State. Nowhere in the constitution did our founders mandate the creation of a public use system, and only a public use system. The term was well known; such a thing would have been quite easy.

If the abolition of convict labor in competition with free labor had been the compromise, the language suggested by labor to accomplished that goal would have been adopted. *See* THE TACOMA DAILY LEDGER, July 18, 1889, at 4 (*available in* WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, *supra*, at 4-24) (discussing suggested language providing: "Convict labor shall not be employed in competition with free labor."). The fact the drafters rejected the labor advocates' language is significant. *State ex rel. Gallwey v. Grimm*, 146 Wn.2d 445, 464-65, 48 P.3d 274 (2002) (court may consider language rejected by the constitutional convention in determining meaning).

The majority does note the different concerns that prompted article II, section 29. Majority at 484-85. But the majority finds that competition with the private sector was somehow more equal than the other concerns, apparently because of the proximity in time of a specific labor union's request that convict contract labor be addressed in the new constitution. Majority at 484-86. This overstates the evidence. First, the concern was hardly a surprise; organized labor across the nation had been fighting convict contract labor for decades at the time of our constitutional convention. WILLIAM J. FARRELL, PRISONS, WORK AND PUNISHMENT 32, 98 (1994); Blake McKelvey, *The Prison Labor Problem: 1875-1900*, 25 J. AM. INST. CRIM. L. & CRIMINOLOGY 254, 268 (1925); WHITIN, *supra*, at 7; majority at 488-89. Our founders were well acquainted with labor's concerns. Second, the progressive opposition to convict contract labor had been growing for decades and there was a strongly progressive streak in our State at that time. *See, e.g.*, Theodore Roosevelt, *The New Penology, in* AMERICAN ACADEMY OF POLITICAL AND SOCIAL SCIENCE, THE ANNALS: PRISON LABOR 4-5 (1913) (by 1913 an explicit part of the progressive platform was the abolition of the convict contract labor system); 1 HERBERT HUNT & FLOYD C. KAYLOR, WASHINGTON WEST OF THE CASCADES 359 (1917); majority at 486-88. Third, there was growing awareness of the terrible corruption endemic in the sale of the State's power to force labor. Majority at 489-90; *see generally* Wash.

State Dep't of Inst., *State Prison—A History of Adult Corrections in Washington*, PERSPECTIVE 5-7 (Spring-Summer 1966); REPORT ON PRISON LABOR, *supra*, at 32; FARRELL, *supra*, at 93; *cf.* majority at 487-88. All these concerns went into the final compromise. We have no reason to believe labor's concerns were so overriding in the minds of our founders that the words of the constitution must give way.

Properly understood, the overwhelming case authority from other states also undermines the majority's historical interpretation. We disagree with the majority's analysis of the California Court of Appeals decision in *Pitts v. Reagan*, 14 Cal. App. 3d 112, 92 Cal. Rptr. 27 (1971). *See* majority at 493-95. Key to the California court's holding was the fact that, in effect, the State let out the labor of convicts by contract. "There were no individual contracts between the growers and the prisoners. Such contracts as existed were . . . between the growers and state officials." *Pitts*, 14 Cal. App. 3d at 116. The California court properly concluded that this was precisely what the California State Constitution prohibited.

Further, the *Pitts* court stated, and all parties agreed, that a "convict may himself *sell or hire out his services to a private person*, and that parole or other state officials may assist in such rehabilitative efforts." *Pitts*, 14 Cal. App. 3d at 117 (emphasis added).[11] This accurately describes our Class I industries.

---

[11] As further support, the opinion has been interpreted in California the same way by the California Attorney General:

In *Pitts v. Reagan* (1971) 14 Cal. App. 3d 112, it was held that this provision (then of art. X, § 1 of the Constitution), meant "that the state may not let out [i.e., allow to be used, hire out, or permit] convict labor *by contract* to private employers regardless of whether the state or the convicts or both receive the attendant consideration." (14 Cal. App. 3d at p. 118 (emhpasis [sic] added).) *In that case the labor was arranged pursuant to contract between the employer and the state, not with the prisoner* (id., at p. 116), *and after reviewing the proceedings of the California Constitutional Convention of 1878-1879, the court felt the "rather strong probability, that the delegates, or at least the majority, were concerned with the abolition of contracted convict labor generally. . . ." (Id.,* at pp. 118-119.)

63 OPS. CAL. ATT'Y GEN. No. 79-1016, at 33, 36 (1980) (second emphasis added). This accords with my interpretation.

We agree with the majority that, in general, we pay particular attention to the Illinois Constitution, and we recognize that the interpretation of the Court of Claims is contrary to our interpretation. Majority at 496-98 (citing *K.&S. Mfg. Co. v. Illinois*, 7 Ill. Ct. Cl. 107 (1932)). But the Court of Claims is a department of the Illinois Secretary of State's Office, not an appellate court. *See* Illinois Court of Claims, *About the Department of Court of Claims, available at* www.sos.state.il.us/depts/claims/about.html (last visited May 4, 2004). A hard look at the *K.&S.* opinion reveals that it is much less about the constitution, and much more about a 1903 statute that did exactly what the majority says our constitution did; it banned competition. *K.&S.*, 7. Ill. Ct. Cl. at 107. Courts decide cases on statutory grounds if possible; in *K.&S.*, the court reached the right decision under Illinois law. If the Court of Claims were an actual court, rather than effectively a branch of the executive, we would be tempted to dismiss its musings on the Illinois Constitution as mere dicta.

All of the other out of state cases canvassed by the majority, properly read, are predicated on the State's *ownership* of convict labor; the very thing article II, section 29 forbids the State from selling. These cases do not support the majority's implicit holding that our state constitution banned competition qua competition. *E.g.*, *Ove Gnatt Co. v. Jackson*, 173 N.E. 335 (1930), 177 N.E. 607, 607 (Lockyear, J., dissenting) (Ind. Ct. App. 1931) ("the contract system . . . the state sells the labor of the prisoners to private corporations or individuals, and in each the contractor and prison authorities agree upon a task which is supposed to constitute a reasonable day's work."); *Rice v. State*, 1924 OK 1112, 108 Okla. 4, 232 P. 807, 813 (founders motivated by mercy, not by a desire to end competition with free labor); *State ex rel. Greaves v. Henry*, 87 Miss. 125, 40 So. 152, 162 (1905) (describing the old convict-leasing system as between the businesses and the State); *State ex rel. Davis v. Mortensen*, 69 Neb. 376, 95 N.W. 831 (1903); *see Thompson v. Bronk*, 126 Mich. 455, 85 N.W. 1084 (1901)

(petitioner who had been subject to convict contract labor whose conviction was later vacated had no right to compensation); *People v. Hawkins*, 157 N.Y. 1, 13, 28, 51 N.E. 257 (1898) ("contracting" convict labor refers to "practices . . . formerly existed, under which the labor of convicts had become a subject of bargain and sale" and "unpaid, compulsorily enforced labor"); *Nugent v. State of Ariz. Improvement Co.*, 173 U.S. 338, 338-42, 19 S. Ct. 461, 43 L. Ed. 721 (1899) (describing legislatively authorized contracts for convict labor); *Walton County v. Franklin*, 95 Ga. 538, 538, 22 S.E. 279 (1894) (county officials have no power to hire out convicts, therefore contract to do so is unenforceable). The fact that many of these states were using a public use system at the time is simply not relevant.

## CONCLUSION

We should not forget that this is a facial challenge to a statute and program that, by state and federal law, specifically requires that the Department of Corrections take steps to ensure that free labor is not displaced. The majority position that a prison labor program which displaces free labor may so frustrate the intent of the founders in propounding article II, section 29 that it must be deemed unconstitutional is foreseeable, but not in a facial challenge. Majority at 492-93. A program that, as a matter of fact, displaces free labor, *as applied*, may violate article II, section 29—*as applied*. Since displacement is illegal under state and federal law, we will probably never need to reach the question of whether displacement is unconstitutional. The question answered by the majority is simply not before this court within this facial challenge.

We agree our founders were attempting to avoid many evils. Majority at 492-93. It may be that had our founders contemplated the private employment of prisoners, they would have forbidden the private employment of prisoners.

But we do not invalidate legislation on a maybe. Because that is what this court does today, I respectfully dissent.

SANDERS, IRELAND, and OWENS, JJ., concur with CHAMBERS, J.

Motions for reconsideration denied August 18, 2004.